---

## In re KEMP.

(District Court, S. D. New York. January 20, 1919.)

1. BANKRUPTCY ⬤⟳407(5)—DISCHARGE—DENIAL—GROUNDS.

To deny the discharge of a bankrupt on the ground that he obtained a loan by a materially false statement in writing as to his financial condition, it must appear, not only that the statement was false and material, but that it was intentionally false and made with intent to deceive.

2. BANKRUPTCY ⬤⟳407(5)—DISCHARGE—DENIAL—FALSE STATEMENTS.

Where a blank form of financial statement, which a bank required the bankrupt to fill out before discounting his note, included under the term "Contingent Liabilities," "Accommodation Indorsements," and "Indorsed B/R Outstanding," the bankrupt's denial of contingent liabilities, which were not of the class specified, was not false.

3. BANKRUPTCY ⬤⟳407(5)—DISCHARGE—DENIAL.

Where a bankrupt, in stating his financial condition to a bank from which he obtained a loan, omitted a debt which his mother thought was due her, as well as a possible claim which the mother might have against him, but which he denied, *held*, that discharge should not be denied on the ground the bankrupt had made a materially false statement in writing; the evidence disclosing that the mother did not intend to collect the debt unless the bankrupt was able to pay it, and though it was scheduled she filed no proof of claim, and that the bankrupt insisted he did not owe the debt.

In Bankruptcy. In the matter of the bankruptcy of Peter C. Kemp. On motion to reverse a report of the referee recommending denial of discharge of the bankrupt, and for an order directing that discharge be granted. Report reversed, and bankrupt discharged.

⬤⟳For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

Kaye & Scholer, of New York City, for objecting creditor.
Irving L. Ernst, of New York City, for bankrupt.

MAYER, District Judge. The sole ground upon which the referee rests his recommendation against discharge is that the bankrupt made a materially false statement to the bank in a writing dated July 2, 1917, in that he omitted liability to his mother aggregating $8,000.

[1] It is, of course, well settled that the statement must not only be false and material, but must be intentionally false, made with intent to deceive. Kemp was a depositor with the Fourteenth Street branch of the bank, and from time to time had applied for and presumably obtained loans in the ordinary course of business. In the latter part of June, 1917, Kemp saw Meehan, the manager of the bank branch, and sought to discount a note of $3,000. Meehan gave Kemp a blank form of statement to fill out, and Kemp returned on July 2d, with the statement dated that day and filled out. In this statement Kemp set forth the various items of his assets which aggregated $40,824.37 and his liabilities on notes and accounts payable which aggregated $17,600, thus showing a net worth of $23,224.37. One of the items to be answered on the printed blank was "other liabilities" to which Kemp made no answer, and another was printed thus:

"Contingent Liabilities.   Accommodation Indorsements.
                    "Indorsed B/R Outstanding."

—and to each of these Kemp answered "No."

[2] As it is urged that Kemp's liability to his mother, if not absolute, was, in any event, contingent, that contention may be disposed of at the outset. It is plain that the bank, in its printed form, clearly defined what was meant by "contingent liabilities" for by the bracketing as above shown, the bank confined its inquiry as to "contingent liabilities" to "accommodation indorsements" and "indorsed B/R outstanding.

As Kemp had no "contingent liabilities" under these heads, his answer was truthful; but, in any event, as will presently appear, if Kemp was indebted to his mother, it was an absolute and not a contingent liability.

[3] The question, then, is whether the bank proved an absolute liability from Kemp to his mother. The transaction between Kemp and the bank is briefly outlined in Meehan's testimony:

"Q. Mr. Kemp brought in the note at the same time that he brought the financial statement in, Mr. Meehan?   A. He did.

"Q. When he brought that statement in, did you have any conversation with him in regard to the showing of the statement?   A. I did.

"Q. What was the conversation?   A. I asked him if this was an exact statement of his condition, and he said it was.

"Q. Did you then discount the note for Mr. Kemp?   A. I had a further conversation with him.

"Q. To what effect?   A. I asked him what caused the depreciation in his net active assets between his previous statement and this one.

"Q. In other words, he had given to you a previous statement?   A. He had.

"Q. And you compared the two?   A. I did.

"Q. And called his attention to the difference?   A. Of about $6,000.

"Q. In what?   A. It had depreciated; that is, the surplus had depreciated.

"Q. What conversation was had in regard to this depreciation of the surplus? A. I asked him what occasioned it, and he said losses on contract work.

"Q. And despite the fact that this depreciation occurred in the surplus, upon the presentation of this financial statement and the conversation that you just related, you were willing to discount his note? A. I was.

"Q. And thereupon you discounted his note? A. I did.

"Q. After these various conversations that you testified to? A. Yes. * * *

"Q. Mr. Meehan, did Mr. Kemp say anything to you at the time of this conversation, or these various conversations that you related, about any money owing to his mother? A. He did not.

"Q. If you had known that there was additional money owing to his mother, in addition to this shrinkage in the surplus, would you have made this loan to Mr. Kemp? A. I would not."

From the foregoing it is apparent that Meehan was satisfied with the statement, but would not have made the loan if there was additional money owing to Kemp's mother.

The alleged liability of Kemp must be ascertained solely from Kemp's testimony. There was no other witness on the point. There are two items, one of $6,000 and one of $2,000. As to the $6,000, Kemp, it seems, as a youth of 18, had started his business life in his father's coal business, and was an employé of his father until the latter's death in 1908. The father's business was left to Kemp, under a provision in the father's will that Kemp should pay his mother $1,000 annually. At his examination on June 26, 1918. Kemp testified that "about seven years ago" he had to move out of what had been his father's place of business, and therefore had to buy a coal yard in Greenwich street. "About seven years ago" would be "about" June 26, 1911, more than six years prior to July 2, 1917. Kemp then took the position with his mother that he thought he was not obligated to pay her the $1,000 per annum, which he had been paying prior to his purchase of the Greenwich street yard. The mother, at that time, took the contrary view:

"She said she thought I did. She said my sisters thought I did. I said, 'The old business of my father on Hudson street was given up, and I opened up a new business on Greenwich street,' and I did not think I owed anything, and for that reason I did not pay it."

On further examination Kemp insisted that the purchase of the Greenwich street yard was some seven years previous, although there was some contradiction in his testimony given in February, 1918, which would fix the date about February, 1913. Kemp, however, never paid anything to his mother, and she never made any demand of any kind or description.

The situation, thus, is that on Kemp's testimony, which is the sole testimony relied on by the bank, he had no obligation (both by way of the statute of limitations and his assertion as to his father's will) to pay his mother after he moved from Hudson street, and both his conduct and that of his mother confirm this view.

Suppose the mother sought to recover against Kemp on the testimony as it stands in this record; could any judgment be obtained? Suppose she had filed a claim herein on this testimony; would it

have been allowed? As the answer must be in the negative, it nec-essarily follows that the bank has not proved liability in this regard.

As to the $2,000: When Kemp was buying the Greenwich street yard, he needed $2,000 as part of the purchase price, and borrowed that sum from his mother, giving her a note secured by a chattel mortgage on horses and trucks, which was never filed. The date of this transaction is not clear. It may have been 1911 or 1913, and, as the note was payable five or six months after date, it may be that the note, even if made in 1911, was not barred by the statute of limitations in July, 1917. But the parties evidently did not treat the matter as a debt. Payment was never demanded, interest was never paid, and the note apparently was left in Kemp's safe without any attention being paid to it.

If it be assumed that Kemp's mother could have recovered on this note, it is, nevertheless, plain that Kemp, neither in regard to this $2,000 note nor in regard to the $6,000, believed that he was under any liability to his mother. The testimony fully justifies the conclusion that the transactions were of the kind familiar between a mother and a son, where the mother never intends to proceed against the son, and only expects payment if the son is able to make it.

Therefore, even if it were to be held that there was a liability on the part of Kemp on both items, it is clear that there was no intent on his part to make a false statement or to deceive. It may be assumed, if Kemp had said to the bank, "I owe my mother $8,000," the bank would not have discounted the note. That, however, is not the question, because the matter would not have thus shaped up. Would the bank have refused the credit if Kemp had said, "I borrowed $8,000 from my mother, but she has never asked me for it, and will not seek to recover it from me," and had then explained the situation as it is set forth in the testimony? Meehan would probably have said that he would make the loan if the mother assured the bank, in satisfactory form, that she would make no claim against her son.

In point of fact, the mother has not filed any claim herein, and her time so to do has expired. Indeed, this controversy, in all probability, would never have arisen, but for the notation in the schedules:

"Sarah A. Kemp, Mawwah, N. J., not considered an absolute liability, $8,000."

Capable and conscientious counsel not infrequently ascertain from a client the facts concerning transactions which clients either disregard or look upon indifferently. It is then desirable to make just such a notation, in order (1) to safeguard the client, and (2) to put the trustee on notice, if any claim is made. It is not often that a case is presented where the intent which the statute requires is so plainly lacking. In re Kerner, 250 Fed. 993, —— C. C. A. ——; Gilpin v. Merchants' Nat. Bank, 165 Fed. 607, 91 C. C. A. 445, 20 L. R. A. (N. S.) 1023; In re Braus, 248 Fed. 55, 160 C. C. A. 195.

The report of the referee is reversed, and the bankrupt will be discharged.